**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

LARRY FLENOID,              )
                                  )
          Petitioner,       )
                                  )
     v.                      )         No. 4:11CV330 LMB
                                  )
CHRIS KOSTER and CHARLES L.   )
LOCKETT,                   )
                                  )
          Respondents.    )

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the petition will be dismissed without further proceedings.

## I.   BACKGROUND

Petitioner was found guilty by a jury of first-degree murder, two counts of armed criminal action, kidnapping, and first-degree assault. Resp't Ex. D at 2. The trial court sentenced Petitioner as a prior and persistent offender to three life sentences, three thirty-year sentences of imprisonment, and one seven-year term of imprisonment, with all sentences to run consecutively, along with his prior federal sentence. Id.

On appeal, Petitioner raised four points of error: (1) that there was insufficient evidence to support a finding of guilt for first-degree murder; (2) that there was insufficient evidence to support a finding of guilt for kidnapping; (3) that the trial court violated the Interstate Agreement on Detainers ("IAD"); and (4) that the trial court erred in failing to *sua sponte* instruct the jury to

disregard the prosecutor's remark during closing argument that improperly stated the law.  Id. at 11-12.

The Missouri Court of Appeals for the Eastern District affirmed.  Id. at 26.  In its decision, the state appellate court found the facts as follows:

[Ursula Page] ("Page") testified that she and [Petitioner] were introduced by a mutual friend at a lounge in 1993, they became friends, and then they were involved romantically sporadically for approximately eight years.  At one point during the relationship, the couple became engaged, but [Page] testified that the engagement ended in 1997.  One daughter (Daughter) was born in 1997 from the relationship; [Page] also had a son (Son), who was not born from the relationship and was about eight years older than daughter.  Two months after Daughter was born, [Page] and her two children moved into [Petitioner]'s home with him on Castillon.

In 1998, [Page]'s sister (Sister), her husband Mr. Forehand, and her three children, T.D., T.F., and S.N. (collectively referred to as the Forehand family) came to live with [Page] and [Petitioner] on Castillon when they moved to the St. Louis area from Virginia.  The Forehand family stayed with [Page] and [Petitioner] for a couple of months on Castillon before moving into their own home on Hallwood.

In March 1999, [Petitioner] was incarcerated in a federal prison in Springfield, Missouri.  [Page] remained romantically involved with [Petitioner] and continued to live at his house on Castillon during his incarceration.  While [Petitioner] was at the institution, [Page] visited him, sent him letters, and had phone conversations with him, but their relationship changed into a friendship because [Petitioner] was seeing other people.  However, in April 2000, when [Petitioner] was released from the institution in Springfield, [Page] went there to drive him back to St. Louis.

[Petitioner] then moved to Dismas House, a halfway house in St. Louis.  [Page] continued to stay at the house on Castillon.  [Page] continued to visit [Petitioner] and speak with [Petitioner] on the telephone.  [Page] would pick up [Petitioner] and take him to work, but did not pick [Petitioner] up from work and return him to Dismas House because she was working at a casino.  On the weekend beginning on Friday, May 5, 2000, [Petitioner] had a "weekend pass" to leave Dismas House.  [Page] testified she told [Petitioner] the day before that she was planning on spending the weekend at Sister's house instead of staying with [Petitioner].  [Petitioner] did not object, she said.

On May 5, 2000, [Page] worked the 10 a.m. to 6:30 p.m. shift.  She did not give [Petitioner] a ride to work that day, and made no plans to pick up [Petitioner] at work

that evening.  [Page] said [Petitioner] was going to drive his own car back to the Castillon address, and that he had agreed to stay with the children and take them to the zoo the following morning.  [Page] left work, picked up her children from Sister's house and took them to the Castillon address, got ready to go to a party with her sister, and drove back to Sister's house.  At Sister's house, [Page] was told that [Petitioner] was trying to contact her.  [Petitioner] called back and told [Page] that he did not have a ride from work and needed her to give him a ride.  [Petitioner] and [Page] began arguing on the phone because she thought he was going to drive himself home.

Finally, [Page] left Sister's house to pick up [Petitioner] from work, and found [Petitioner] waiting for her at the highway exit ramp near his work.  Once [Petitioner] got in [Page]'s car, they began arguing.  [Petitioner] was "screaming, ranting, and yelling.  Screaming that [Page] should have been [t]here earlier," according to [Page].  [Page] testified that she remembered [Petitioner] said he was going to kill her and Sister.  Then [Petitioner] "smacked" [Page] in the face.  When [Page] defended herself by throwing her hands up, [Petitioner] started punching her in the stomach and in the face, and the car spun around.  After the car spun around, [Petitioner] told [Page] to move to the passenger seat and let him drive.  As [Petitioner] began driving, he started pulling and tearing [Page]'s skirt off of her as he continued hitting her.  [Petitioner] was yelling that he was going to kill her and Sister.

[Petitioner] drove back to the Castillon address, pulled into the garage, and went into the house.  When he went into the house, [Page] said she jumped out of the car and ran, wearing only a torn shirt and underwear.  She thought [Petitioner] was chasing her while driving her car, and so she hid in some bushes, and then ran to her Son's friend's house at the end of the block.  A woman, Lawanda Watson (Ms. Watson) opened the door, let [Page] in and gave her some clothes.  [Page] called the police, and then Sister.  When the police responded, they took her back to [Petitioner]'s Castillon address.  [Page] testified that she saw [Petitioner] standing on the side of the house and running toward the back of the house into a wooded area.  [Page] told the police that "that was him," but the police did not go back to look for him.  She did not tell the police that [Petitioner] had threatened to kill her or that he assaulted her, nor did [Page] tell police [Petitioner]'s name because she knew he had a criminal record and did not want to see him go back to jail.  The garage door to the house was open.  [Page] went through the garage and into the house to retrieve the children and clothes for the next day for work.  [Page] then drove back to Sister's house.

Once [Page] arrived at Sister's house, [Page]'s mother was also there because Sister called her and told her what happened.  Also present at the Forehand house was the Forehand family, plus [Page], Son, and Daughter.  After [Page] arrived at Sister's house, she put the children to sleep and then went to the basement to go to sleep.  [Page] and her mother slept in one bedroom in the basement, and Sister, Daughter,

and Sister's son slept in the other bedroom.  Mr. Forehand was on the other side of the basement watching television.

Sister testified that as she was lying in bed, she saw [Petitioner] peeking through the window of her bedroom.  She called for her husband, and as she was running out of the room carrying Daughter, he was running into the room.  Mr. Forehand said to her, "I got this."  She ran upstairs to her oldest daughter's room and just stood in shock.  She testified that she heard a lot of noise, and after a while she called 911.

[Page] awoke to her Sister screaming for Mr. Forehand to "get down here."  [Page] and her mother ran upstairs, and [Page] saw Mr. Forehand in the kitchen at the computer.  She ran to one of the Forehand's daughter's bedrooms, to the right of the kitchen, grabbed her niece, T.F., and they got under the bed.  [Page] testified that she "heard a lot of commotion," after which [Petitioner] came into the room and started screaming for [Page] to get out from under the bed.  He looked underneath the bed, grabbed [Page]'s arm, and [Page] climbed out from under the bed.  [Petitioner] began pulling [Page] toward the front door, but T.F. was pulling [Page] back the other way.  [Petitioner] pointed a gun at T.F.'s head, but [Page] jumped in front of her and told [Petitioner] not to shoot T.F. because [Page] was going to go with [Petitioner].  [Petitioner] grabbed [Page] by the neck and pulled her out the front door.  [Page]'s mother then came upstairs and said, "[Petitioner], don't take my baby away from here," and [Petitioner] responded that he would never do anything to hurt [Page].  [Petitioner] continued pulling [Page] by the neck with a gun pointed at her head.

Sister testified that meanwhile, she put the children in the closet, then went to the living room and looked out the window to see [Petitioner] with a gun in his hand with [Page].  She heard her mother say that Mr. Forehand had been shot, so Sister ran back downstairs and saw her husband laying outside the glass doors of the basement.  Sister called the police again about the shooting.  She tried to turn over her husband, but he was entangled in the curtains and screen.  Bloody shoe prints were seen from Mr. Forehand's body through the basement, up the stairs, through the kitchen, and to T.F.'s bedroom.  Bloody hand prints were found on the same bedroom door and on the drywall going upstairs.  The fingerprints on the drywall and on the door belonged to [Petitioner], according to the supervisor of the St. Louis County Police Department's fingerprint unit.

Once [Petitioner] and [Page] got into [Page]'s car, a Mazda 626, [Page] got in the passenger seat, but never shut the door all the way.  The dome light did not work, so [Petitioner] did not know that the door was not shut.  [Petitioner] got into the car and began driving, and said, "Look what you made me do."  [Page] asked him what he did, but [Petitioner] did not say anything.  [Petitioner] set the gun on the console.  [Page] grabbed the gun, threw it out of the door and then jumped out of the car after the gun.  [Petitioner] grabbed [Page]'s hand before she was out of the car, and [Page]

testified that she felt like [Petitioner] accelerated the car at that point. [Page] started screaming, "you're going to kill me. My head is going to hit the wheel." Her body was turning back and forth, at which time [Page] received first-degree burns all over her body from the dragging on the road. As [Page]'s hand slipped out of [Petitioner]'s hand, she fell to the ground and then jumped up and started running back to Sister's house. When she returned to Sister's house, she heard people screaming and called the police.

Officer Craig Molden (Officer Molden) with the St. Louis County Police Department testified that in the early morning hours of May 6, 2000, at approximately 3:15 a.m., he received a dispatch for a burglary in progress on Hallwood Drive. He proceeded to that location, and while he was traveling, the dispatch was updated to a shooting. He also heard approximately four repetitive gunshots. As he approached, he saw a black Mazda 626 in front of the residence with no lights on, which began traveling away from him. Not knowing whether this car was part of the original call, he followed it and observed that the lights came on after it turned onto the next street. Officer Molden then saw the passenger door open and a female tried to exit the vehicle, but it appeared she was hung up on something and was being dragged. He backed off from the vehicle, and the Mazda veered to the right, hitting a concrete pillar. Officer Molden testified that the front of the car was jacked up, bouncing the car a little bit and the female broke loose and began running away, past his police car. Officer Molden immediately exited his vehicle and approached the driver's side door of the Mazda. He commanded for the driver to exit the vehicle and get on the ground, but the driver did not comply. Officer Molden said the driver continued to put the car in drive, step on the gas, reverse, and step on the gas, trying to dislodge the car from the pillar. Every once in a while, the driver turned his attention to Officer Molden at the door and "kind of glare[d] at me, smirk[ed], smile[d] and turn[ed] his attention back to the vehicle." When Officer Molden saw that the driver was not heeding his commands, he grabbed his baton and broke the car window. He reached into the car to grab the driver, but the driver fled out of the passenger's side door. Officer Molden called for assistance and began a foot pursuit through the backyard of a residence, in front of residences, and running towards a wooded area. The officer followed briefly into the woods, but then called out the suspect's description and went back to his vehicle and the Mazda, which were still running. He secured the Mazda as evidence. Officer Molden identified the suspect as the [Petitioner].

Officer Michael Castellano, who was called to assist Officer Molden, testified that during a canine search of the area around the Hallwood address, he found a Smith and Wesson revolver in the side yard of the residence next door to the Forehand's house. The gun appeared to have blood all over the exterior of it. The gun had one live round still in it, and five spent casings.

Dr. Michael Graham performed an autopsy on Mr. Forehand.  Mr. Forehand had two gunshot wounds and several sharp injuries, which were either cuts or stabs.  One bullet entered the lower part of Mr. Forehand's right upper arm, passed through the meaty part of the arm without striking the bone, and came out on the back outside portion of the arm.  The other bullet entered the upper part of the left chest, went through the upper part of the left lung, through the aorta, and lodged itself in the soft tissue of the right side of the back.  There were particles of gunpowder on his chest, which meant the end of the gun was within a foot or a foot and a half of the injury to the aorta, and probably "unsalvageable" within a couple of minutes.  He could not have been surgically repaired.

[Petitioner] was found and arrested in Kansas City on July 14, 2003.  [Petitioner] had an Alabama driver's license with his own photograph, but with a different name.  [Petitioner] also had a Social Security card and a traffic ticket in his possession written to the same name on the Alabama license.

During trial, [Petitioner] testified that he had never before been physically violent with his [Page], but on the evening of May 5, 2000, during the car ride home from his work, he "smacked" her and her glasses got knocked.  [Petitioner] said he did not threaten to kill [Page], Sister, or Mr. Forehand.  Once they got home and were inside the house, [Petitioner] heard a door slam, then found all the kids, but did not find [Page].  [Petitioner] drove back to his house, jumped out of the car and ran when he saw [Page] pulling up with the police.  He did not want to go back to jail for slapping [Page].  [Petitioner] ran down some railroad tracks, and called his mother and told her what was happening.  [Petitioner]'s mother told him to turn himself into the police, and [Petitioner] agreed that he was going to do so.  [Petitioner] testified that a worker for his uncle, known as Squirrel, picked him up.  [Petitioner] asked Squirrel to take him to the Forehand's address on Hallwood so that he could talk to [Page].  When he arrived at the Hallwood address, he went to the side door.  He testified that Mr. Forehand came to the door with a gun in his hand, but did not see [Petitioner] because he ducked down.  [Petitioner] then went down toward the basement, where he thought [Page] would be.  [Petitioner] testified that when he got near the basement, Squirrel was a couple of steps behind him, and then he saw Squirrel with a gun in his hand.  [Petitioner] saw Mr. Forehand, and then grabbed Squirrel and "tussled," and a shot was fired.  [Petitioner] then "became discombobulated" and lost consciousness, he testified.

[Petitioner] testified that when he "woke up," he saw Mr. Forehand bending down on one knee.  When [Petitioner] tried to pick him up, Mr. Forehand said "something to the effect that I can't," and [Petitioner] laid him back down.  The next thing [Petitioner] remembered was being upstairs in the bedroom, hearing giggling, and then he tried to tell [Page] that he wanted to talk to her.  He remembered telling [Page]'s mother that he would never hurt [Page], and then he and [Page] went to the

-6-

car.  He remembered driving to the house on Castillon, but then "jumping off the car again and running."  [Petitioner] ran to a family friend's house, where he had his injuries patched, and then he went to Columbia, Missouri.  [Petitioner] was worried that his parole would be violated.  He also went to Denver, and then to Kansas City where he was arrested and brought back to St. Louis.

Id. at 3-11.

Petitioner timely filed a motion for postconviction relief under Missouri Court Rule 29.15 that was in excess of 300 pages.  Resp't Ex. E at 2-309.  The court appointed counsel, and counsel filed an amended motion, which superseded the pro se motion.  See Norville v. State, 83 S.W.3d 112, 114 (Mo. Ct. App. 2002).  In the amended motion, Petitioner argued that trial counsel was ineffective for (1) failing to offer a jury instruction directing the jurors only to consider Petitioner's prior convictions when weighing the credibility of his testimony; (2) failing to object to the prosecutor's misstatement of the law during closing argument; (3) failing to investigate and subpoena three witnesses; (4) failing to introduce the entire contents of a letter Petitioner wrote to a newspaper columnist; and (5) failing to strike a venire panelist who was allegedly tainted by another panelist, who had stated she could not be fair.  Resp't Ex. E at 315-20.  The motion court denied relief without holding an evidentiary hearing.  Id. at 364-72.  The motion court also held that the allegations in Petitioner's pro se motion were not properly before the court.  Id. at 371-72.

Petitioner proceeded pro se on appeal.  Resp't Ex. F.  He argued that counsel was ineffective for (1) failing to provide him with guilt phase witnesses who would confirm his theory of defense; (2) failing to file a motion to suppress the contents of a letter Petitioner wrote to a newspaper columnist; (3) failing to offer a jury instruction directing the jurors to only consider Petitioner's prior convictions when weighing the credibility of his testimony; (4) failing to object to the prosecutor's misstatement

of the law during closing argument; (5) failing to move the trial court to exclude the entire venirepanel because of a comment by panelist Schmitz; and (6) that postconviction counsel abandoned him by failing to raise meritorious claims raised in Petitioner's pro se motion.  Resp't Ex. F at 11-12.

The Missouri Court of Appeals affirmed, finding that Petitioner's claims failed on the merits. Resp't Ex. H.

Petitioner filed the instant petition for writ of habeas corpus on February 14, 2011.  Petitioner is currently imprisoned at USP Terre Haute, where Charles Lockett is the Complex Warden.  Both Charles Lockett and Chris Koster, the Attorney General for the State of Missouri, are the proper Respondents in this action under Rule 2(b) of the Rules Governing § 2254 Cases.

## II.   GROUNDS FOR RELIEF[1]

(1)   In ground one, Petitioner raises twenty-eight separate claims of ineffective assistance of counsel:

1.   Trial counsel was ineffective for failing to introduce evidence that he had a life-long fear of the police.

2.   Trial counsel was ineffective for failing to obtain a psychological examination of Petitioner.

3.   Trial counsel was ineffective for failing to investigate or present his mother, brother, and nephew as guilt phase witnesses.

4.   Trial counsel was ineffective for failing to hire a medical examiner to testify as to Page's injuries.

5.   Trial counsel was ineffective for failing to hire a firearms expert.

---

[1]The manner in which petitioner presented his claims is somewhat confusing.  Petitioner's amended petition [ECF No. 34] refers to claims he presented in an addendum to an earlier pleading [ECF No. 24].  Respondent has responded to the claims in the earlier pleading, and the Court will consider these claims.

6.      Trial counsel was ineffective for failing to hire a blood spatter expert.

7.      Trial counsel was ineffective for failing to hire an urban affairs scholar.

8.      Trial counsel was ineffective for failing to hire a memory expert.

9.      Trial counsel was ineffective for failing to hire a dream expert.

10.     Trial counsel was ineffective for failing to hire a reconstruction expert.

11.     Trial counsel was ineffective for failing to hire a DNA expert.

12.     Trial counsel was ineffective for failing to depose Detective Christy.

13.     Trial counsel was ineffective for failing to depose Officer Castellano.

14.     Trial counsel was ineffective for failing to obtain St. Louis County Police Department "Policy Directives regarding "RESPONSE TIME" and for failing to effectively cross-examine Officer Molden.

15.     Trial counsel was ineffective for failing to attempt to bar testimony from Page identifying the gun Petitioner possessed on the night of the crime.

16.     Trial counsel was ineffective for failing to challenge the state's motion in limine seeking to bar the admission of a recording Petitioner left on the answering machine of Page's mother.

17.     Trial counsel was ineffective for failing to challenge the trial court's jurisdiction or raise a double jeopardy defense.

18.     Trial counsel was ineffective for failing to file a motion requiring the state to produce all records or transcripts showing that he had been untruthful.

19.     Trial counsel was ineffective for failing to file a motion to suppress the contents of a letter Petitioner wrote to a newspaper columnist.

20.     Trial counsel was ineffective for failing to obtain personal letters he had exchanged with Page.

21.     Trial counsel was ineffective for failing to investigate how the random jury pool "conveniently" included a panel member who had personal knowledge about the crime.

-9-

22.     Trial counsel was ineffective for failing to obtain an aerial photograph of the crime scene.

23.     Trial counsel was ineffective for failing to move for dismissal of the case for violations of Petitioner's speedy trial rights.

24.     Trial counsel was ineffective for failing to properly impeach Page because of inconsistent statements.

25.     Trial counsel was ineffective for failing to properly impeach Bethany Forehand because of inconsistent statements.

26.     Trial counsel was ineffective for failing to object to the showing of a silent video showing the interior of the Hallwood house.

27.     Trial counsel was ineffective for introducing Petitioner's criminal history into evidence.

28.     Trial counsel was ineffective for failing to object on hearsay grounds when the prosecutor cross-examined him regarding his prior inconsistent statements.

(2)     The prosecutor's decision to seek the death penalty was vindictive and motivated by a desire to intimidate him into pleading guilty, and the prosecutor "conspired" with the police officer witnesses to present perjured testimony.

(3)     The trial court erred in denying his motion for acquittal at the end of trial because the evidence was insufficient to support the conviction.

(4)     The trial court abused its discretion "during the entire proceedings."

(5)     Direct appeal counsel was ineffective for failing to bring meritorious claims and for failing to request the appellate court to rehear his appeal en banc.

(6)     Postconviction counsel was ineffective for failing to bring meritorious claims of ineffective assistance of trial counsel that Petitioner had raised in his pro se motion for postconviction relief.

(7)     The Missouri Court of Appeals violated his constitutional rights by rejecting his claims.

## III.     PROCEDURAL DEFAULT

### A.    Standard

To avoid defaulting on a claim, a petitioner seeking habeas review must have fairly presented the substance of the claim to the state courts, thereby affording the state courts a fair opportunity to apply controlling legal principles to the facts bearing on the claim. Wemark v. Iowa, 322 F.3d 1018, 1020-21 (8th Cir. 2003) (quotation marks omitted).  A claim has been fairly presented when a petitioner has properly raised the same factual grounds and legal theories in the state courts that he is attempting to raise in his federal petition. Id. at 1021.  Claims that have not been fairly presented to the state courts are procedurally defaulted. Id. at 1022 (quoting Gray v. Netherland, 518 U.S. 152, 161-62 (1996)).  Claims that have been procedurally defaulted may not give rise to federal habeas relief unless the petitioner can demonstrate cause and prejudice for the default. Id.  "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986).

Missouri requires the raising of constitutional claims at the first available opportunity.  See In re J.M.N., 134 S.W.3d 58, 73 (Mo. Ct. App.2004); In re T. E., 35 S.W.3d 497, 504 (Mo. Ct. App. 2001).  Alleged trial court errors, including constitutional claims of trial court error, must be raised on direct appeal; for "[p]ost-conviction motions cannot be used as a substitute for direct appeal or to obtain a second appellate review."  State v. Clark, 859 S.W.2d 782, 789 (Mo. Ct. App.1993); accord State v. Twenter, 818 S.W.2d 628, 636 (Mo. 1991) (en banc) (a post-conviction proceeding "is not a substitute for direct appeal, and matters that properly should have been raised by direct appeal may not be litigated in a post-conviction proceeding").  "If the allegations of trial error are constitutional violations, they are not cognizable [in a post-conviction proceeding] unless exceptional

circumstances are shown which justify not raising the constitutional grounds on direct appeal." <u>Clark</u>, 859 S.W.2d at 789; <u>accord</u> <u>Amrine v. State</u>, 785 S.W.2d 531, 536 (Mo. 1990) (en banc); <u>Allen v. State</u>, 903 S.W.2d 246, 247 (Mo. Ct. App. 1995).  Therefore, if a trial court's alleged violation of the constitution is not raised on direct appeal, the claim is defaulted absent exceptional circumstances justifying the failure to raise the errors on direct appeal, and then the matter may be pursued in a post-conviction proceeding.

      **B.**    **Discussion**

          1.    <u>Grounds One and Six: Ineffective Assistance of Trial Counsel and Whether Such Claims are Preserved Under *Martinez v. Ryan*</u>

Twenty-six of the twenty-eight claims of ineffective assistance of counsel were not presented to the Missouri Court of Appeals in Petitioner's pro se appellate brief.  Petitioner did bring these claims in his pro se motion under Rule 29.15, but counsel eliminated them in the amended motion. The grounds Petitioner failed to bring on appeal are that counsel was ineffective for: (1) failing to introduce evidence that he was fearful of the police; (2) failing to obtain a psychological examination of Petitioner; (3) failing to hire a medical examiner to testify as to Page's injuries; (4) failing to hire a firearms expert; (5) failing to hire a blood spatter expert; (6) failing to hire an urban affairs scholar; (7) failing to hire a memory expert; (8) failing to hire a dream expert; (9) failing to hire a reconstruction expert; (10) failing to hire a DNA expert; (11) failing to depose Detective Daniel Christy; (12) failing to depose Officer Michael Castellano; (13) failing to obtain St. Louis County Police Department "Policy Directives regarding "RESPONSE TIME" and for failing to effectively cross-examine Officer Molden; (14) failing to attempt to bar testimony from Page identifying the gun Petitioner possessed on the night of the crime; (15) failing to challenge the state's motion in limine

seeking to bar the admission of a recording Petitioner left on the answering machine of Page's mother; (16) failing to challenge the trial court's jurisdiction or raise a double jeopardy defense; (17) failing to file a motion requiring the state to produce all records or transcripts showing that he had been untruthful; (18) failing to obtain personal letters he had exchanged with Page; (19) failing to investigate how the random jury pool "conveniently" included a panel member who had personal knowledge about the crime; (20) failing to obtain an aerial photograph of the crime scene; (21) failing to move for dismissal of the action for violations of Petitioner's speedy trial rights; (22) failing to properly impeach Page because of inconsistent statements; (23) failing to properly impeach Bethany Forehand because of inconsistent statements; (24) failing to object to the showing of a silent feature showing the interior of the Hallwood house;  (25) introducing Petitioner's criminal history into evidence; and (26) for failing to object on hearsay grounds when the prosecutor cross-examined him regarding his prior inconsistent statements.

Because Petitioner did not raise these grounds in his appellate brief, they are procedurally defaulted.  Petitioner argues that the default should be excused because of his lack of legal knowledge, because he was not represented by counsel in his postconviction appeal, and because he was incarcerated in federal prison in Indiana during his appellate and postconviction proceedings.

In ground six of the petition, Petitioner argues that cause should be found for the default because postconviction counsel was ineffective for failing to raise each of the claims Petitioner brought in his pro se motion.  The Supreme Court recently held in Martinez v. Ryan that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S. Ct. 1309, 1320 (2012).  This rule does not apply to "appeals from initial-review collateral proceedings."  Id.  Therefore, the default may be excused if any of the eliminated grounds of ineffective assistance of trial counsel was "substantial," "which is to say that the prisoner must demonstrate that the claim has some merit."  Id. at 1318.  Accordingly, the Court will review each of Petitioner's claims of ineffective assistance to determine if any of them have merit.

To establish a claim of ineffective assistance of counsel, a movant must satisfy the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984).  First, under the "performance" component, the movant must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." Strickland, 466 U.S. at 687. Second, under the "prejudice" component, the movant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  "It is not sufficient for a defendant to show that the error had some 'conceivable effect' on the result of the proceeding because not every error that influences a proceeding undermines the reliability of the outcome of the proceeding." Odem v. Hopkins, 382 F.3d 846, 851 (8th Cir.2004) (quoting Strickland, 466 U.S. at 693).

Alleged Error 1

Petitioner argues that trial counsel was ineffective for failing to introduce evidence that he had a life-long fear of the police.  Petitioner claims he had a traumatic experience with the police when he was eleven years old and that, ever since then, he has avoided all contact with the police because of his fear.  Petitioner claims that this explains why he fled from the scene, and he argues that such testimony "arguably could have negated the putative guilt form Petitioner having fled the scene."

Petitioner does not allege that had this evidence been submitted to the jury, he would have been acquitted.  As a result, he has failed to demonstrate <u>Strickland</u> prejudice.  Moreover, these allegations are self-serving and incredible, and counsel was not ineffective for failing to bring them before the jury.

Alleged Error 2

Petitioner argues that trial counsel was ineffective for failing to obtain a psychological examination of Petitioner.  Petitioner claims he informed trial counsel that he had a blackout while struggling for the gun in the basement stairwell of the Hallwood address, that he had recurring dreams of the incident before it happened, that he had "blank spots" in his memory, and that he suffered from headaches.  Therefore, he argues, he could not have had the necessary mental state to be guilty of the charged offenses.

Petitioner does not allege that had this evidence been submitted to the jury, he would have been acquitted.  As a result, he has failed to demonstrate <u>Strickland</u> prejudice, and he is not entitled to relief on this claim.

Alleged Error 3

Petitioner argues that trial counsel was ineffective for failing to investigate or present his mother, brother, and nephew as guilt phase witnesses.  Petitioner claims that these witnesses would have testified as to his peaceful nature and his lifelong fear of the police.  On this claim, the Missouri Court of Appeals stated:

> [Petitioner] claims defense counsel was ineffective for failing to investigate and present witnesses which would provide him a viable defense.  [Petitioner] argues his mother, brother, and nephew were available and willing to testify a man [Petitioner] claims he "tussled" with the night of the shooting, known only as "Squirrel," actually

-15-

existed.  [Petitioner] claims these witnesses would also rebut the State's evidence that [Petitioner]'s car was missing when his home was searched after the shooting.

To prevail on a claim of ineffective assistance of counsel for failing to investigate and call witnesses, [Petitioner] must plead and prove: "(1) trial counsel knew or should have known of the existence of the witnesses; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense." Glass v. State, 227 S.W.3d 463, 476 (Mo. banc 2007)].  Trial counsel's decision not to call a witness to testify is presumptively a matter of trial strategy and will not support [Petitioner]'s claim of ineffective assistance of counsel unless [Petitioner] clearly establishes otherwise.

Here, the evidence [Petitioner] alleges his family members would have provided would not have offered him a viable defense to the murder.  While the State did argue "Squirrel" did not exist, proving "Squirrel's" existence would not have aided Petitioner's defense because it was cumulative of [Petitioner]'s trial testimony. Defense counsel will not be found ineffective for failing to offer cumulative evidence.

Resp't Ex. H at 5-6 (citations omitted).

The Missouri Court of Appeals' holding was a reasonable application of federal law.  See Bucklew v. Luebbers, 436 F.3d 1010 (8th Cir.2006) (counsel not ineffective for not calling witnesses who would damage his case or whose testimony would be cumulative); Hall v. Luebbers, 296 F.3d 685, 694 (8th Cir.2002) (counsel not ineffective for failing to adduce cumulative evidence). Furthermore, Petitioner's family members' testimony to the effect that he had a peaceable nature or was afraid of the police would not have been relevant to whether he committed the crimes he was tried for.  Finally, Petitioner has not shown that the outcome of the case would have been different had such testimony been introduced.  As a result, Petitioner is not entitled to relief on this claim.

Alleged Error 4

Petitioner argues that trial counsel was ineffective for failing to hire a medical examiner to testify as to Page's injuries or medical records.  Petitioner does not, however, allege that the failure

-16-

to hire a medical examiner prejudiced the outcome of his case.  Moreover, Petitioner's claim is wholly conclusory.  As a result, this claim is without merit.

<u>Alleged Error 5</u>

Petitioner argues that trial counsel was ineffective for failing to hire a firearms expert. The City Medical Examiner testified that, due to the gunpowder found on Forehand's chest, the barrel of the gun must have been no farther than eighteen to twenty-four inches from his chest when it was fired.  Petitioner claims that his trial counsel was ineffective for failing to address how the gunpowder could have gotten on Forehand's chest if, as Petitioner argued, the bullet traveled through tempered glass and through drapery before hitting Forehand.  Again, Petitioner fails to allege that he was prejudiced, and his claims are conclusory.  Petitioner is not entitled to relief on this claim.

<u>Alleged Error 6</u>

Petitioner argues that trial counsel was ineffective for failing to hire a blood spatter expert. Petitioner believes that a blood spatter expert could have determined whether there was massive blood loss in the interior of the house, which would have been consistent with his defense theory. Again, Petitioner fails to allege that he was prejudiced, and his claims are conclusory.  Petitioner is not entitled to relief on this claim.

<u>Alleged Error 7</u>

Petitioner argues that trial counsel was ineffective for failing to hire an urban affairs scholar. Petitioner claims that such a witness could have explained to the jury "why black men evade/run from the police."  Petitioner believes this could have "negate[d] the inference, he must be guilty because he fled."  Plaintiff cannot show prejudice.  Page and other members of her family, who knew Petitioner well, were eyewitnesses to Petitioner's crimes and testified against him in open court.  In

light of the overwhelming evidence of his guilt, an urban affairs scholar could not have negated any inferences of guilt.  Petitioner is not entitled to relief on this claim.

Alleged Error 8

Petitioner argues that trial counsel was ineffective for failing to hire a memory expert. Petitioner claims that a memory expert could have testified as to his alleged loss of consciousness and memory loss after the shooting.  Petitioner has failed to allege that he was prejudiced by this failure, and his claim is conclusory.  This claim is without merit.

Alleged Error 9

Petitioner argues that trial counsel was ineffective for failure to hire a dream expert. Petitioner claims that he had had recurring dreams about seeing himself surrounded by blood in the Hallwood address and seeing a gun in Squirrel's hand.  Petitioner has failed to allege prejudice, and his claim is conclusory and irrelevant.  This claim is without merit.

Alleged Error 10

Petitioner argues that trial counsel was ineffective for failing to hire a crime reconstruction expert.  Petitioner believes that the evidence at the scene supports his defense theory, and Petitioner claims that a reconstruction expert could have testified to that fact.  Petitioner has failed to allege prejudice, and his claim is conclusory.  This claim is without merit.

Alleged Error 11

Petitioner argues that trial counsel was ineffective for failing to hire a DNA specialist. Petitioner believes that a DNA specialist could have testified that "blood transferrence [*sic*], and the fact of the victims [*sic*] blood being present on Petitioner, was not evidence of guilt."  First, a fact

witness cannot testify as to whether Petitioner is more or less likely to be guilty.  Second, Petitioner

fails to allege prejudice, and his claim is conclusory.  This claim is without merit.

<u>Alleged Error 12</u>

Petitioner argues that trial counsel was ineffective for failing to depose Detective Christy.

Petitioner argues that Christy lied when he testified that he went to Petitioner's home and Petitioner's

car was not there.  Petitioner says his brother went to his house that night to retrieve his car and was

turned away by police officers.  Petitioner does not offer any substantial argument that his car was

actually there.  Nor does Petitioner allege that if Christy's alleged perjured testimony regarding the

car was revealed, the outcome of the case would have been different.  In light of the overwhelming

evidence at trial, Petitioner cannot demonstrate prejudice.  This claim is without merit.

<u>Alleged Error 13</u>

Petitioner alleges that trial counsel was ineffective for failing to depose Officer Castellano.

Castellano testified at trial that he assisted the Canine Officer in attempting to track Petitioner's

location.  Resp't Ex. I at 900.  Castellano testified that they "went into the woods toward – there is

a creek that runs directly behind the residence there.  And the canine tracked a scent from where the

suspect entered the wooded area back to the residence where the original incident occurred."  <u>Id.</u> at

901.  He stated further: "We started in the wooded area here where Officer Molten saw the suspect

enter and tracked through the wooded area, and came out between the house right near where the

original incident, Hallwood was."  <u>Id.</u>  Petitioner argues that trial counsel's failure to depose and

cross-examine Castellano about the search prejudiced him because no documentation regarding the

canine was offered into evidence, and as a result, the testimony was unreliable.  Petitioner has not

alleged that he was prejudiced by the testimony, nor could he make such a showing in light of the overwhelming evidence of his guilt.  This claim is without merit.

Alleged Error 14

Petitioner argues that trial counsel was ineffective for failing to obtain St. Louis County Police Department "Policy Directives regarding "RESPONSE TIME" and for failing to effectively cross-examine Officer Molden.  At trial, Molden testified that he received a dispatch to the Hallwood address, initially for burglary but the call was soon upgraded to a shooting.  Id. at 866-67.  Before the call was upgraded, Molden heard four gunshots.  Id. at 867-68.  Molden testified that when he arrived at the scene he saw a black Mazda 626 driving away with its lights off.  Id. at 868-69.  Molden decided to follow the car.  Id. at 869.  He further testified:

> Once the black Mazda made a right onto the next street, which would be Vorhof heading northeast.  I observed the lights come on, parking lights, headlights, and taillights all come on.  I saw the passenger door open and a female tried to exit the vehicle.  It appeared she was hung up on something, so she was actually being drug.

Id.  Molden identified the driver of the vehicle as Petitioner.  Id. at 873.

Petitioner contends that Molden's testimony was perjury because he could not "have observed the female being dragged from the vantage point he testified to initially pursuing the vehicle."  Petitioner offers no factual evidence to support this claim, and Molden's testimony is bolstered by Page's testimony, in which she stated that she tried to get out of the vehicle while it was moving and Petitioner held on to her.  Id. at 786.  Petitioner has not alleged prejudice, and he cannot show prejudice in light of the overwhelming evidence against him.  This claim is without merit.

Alleged Error 15

Petitioner argues that trial counsel was ineffective for failing to attempt to bar testimony from Page identifying the gun Petitioner possessed on the night of the crime.  Petitioner maintains that because Page identified the gun in an earlier federal prosecution that she should have been barred from identifying it in the state action.  This claim does not state a constitutional violation.  Petitioner has failed to allege prejudice, and he cannot show that counsel was ineffective for failing to make a meritless motion or objection.  This claim is without merit.

### Alleged Error 16

Petitioner argues that trial counsel was ineffective for failing to challenge the state's motion in limine seeking to bar the admission of a recording Petitioner left on the answering machine of Page's mother.  Petitioner claims he expressed contrition for Forehand's death, and he believes his counsel should have fought harder to have the evidence introduced.  Such evidence would have been irrelevant to whether Petitioner was guilty of the murder, and counsel cannot be ineffective for failing to make meritless objections.  Moreover, Petitioner has failed to allege prejudice, and he cannot demonstrate prejudice in light of the overwhelming evidence of his guilt.  This claim is without merit.

### Alleged Error 17

Petitioner argues that trial counsel was ineffective for failing to challenge the trial court's jurisdiction or raise a double jeopardy defense.  Petitioner contends that the Missouri court did not have the jurisdiction to prosecute him for the charges because he had previously been convicted in federal court for being a felon in possession of a firearm with regard to the same incident.  Petitioner believes this violated his right to be free from double jeopardy.  Although a Defendant may not be prosecuted twice by the same sovereign for the same acts, a subsequent prosecution by a separate sovereign does not violate the Constitution.  Chavez v. Webber, 497 F.3d 796, 802 (8th Cir. 2007).

Petitioner's double jeopardy argument is without merit, and counsel could not have been ineffective for failing to raise a meritless defense.  Moreover, petitioner has failed to allege prejudice.  This claim is without merit.

### Alleged Error 18

Petitioner alleges that trial counsel was ineffective for failing to file a motion requiring the state to produce all records or transcripts showing that he had been untruthful.  Petitioner wanted his counsel to request all of the transcripts from the federal proceedings, because he was concerned that the state would use those transcripts to impeach him if his testimony in the state case differed from that in the federal proceedings.  Petitioner cannot show that counsel was ineffective.  It was not counsel's duty to prevent Petitioner from providing inconsistent testimony in the separate proceedings.  And Petitioner could have obtained the transcripts by purchasing them from the court. Petitioner has not alleged that he was prejudiced, and he cannot show prejudice because it is not likely that the outcome of the proceeding would have been different had counsel obtained the transcripts.

### Alleged Error 19

Petitioner argues that trial counsel was ineffective for failing to file a motion to suppress the contents of a letter Petitioner wrote to a newspaper columnist.  Petitioner contends that only the inculpatory parts of the letter were introduced at trial, and he believes that the remainder of the letter should have been introduced because it would have mitigated the charge of first degree murder.

The Missouri Court of Appeals denied relief on this claim because none of the statements in the letter were exculpatory.  Resp't Ex. H at 8.  Having reviewed the letter, Resp't Ex. E at 339-62, the Court finds that the appellate court's determination was reasonable.  In the letter, Petitioner

admitted to going to the Forehand house with a handgun and stated that the shooting was an accident.  Id. at 340.  Nothing in the letter was exculpatory.  This claim is meritless.

### Alleged Error 20

Petitioner argues that trial counsel was ineffective for failing to obtain personal letters he had exchanged with Page.  Petitioner argues that the contents of the letter would have served to impeach Page's testimony.  Petitioner has failed to allege prejudice, and his claim is conclusory.  This claim is without merit.

### Alleged Error 21

Petitioner argues that trial counsel was ineffective for failing to investigate how the random jury pool "conveniently" included a panel member who had personal knowledge about the crime.

> During the small group voir dire of Panel Number 5, [panel member Schmitz] testified she recognized [Petitioner's] name, and her husband was a police officer working with the United States Marshal when this case occurred.  Schmitz stated her husband did not participate directly in the case.  Schmitz did not believe she would be able to put aside the information she received outside the courtroom if she were chosen to sit on the jury.

Resp't Ex. H at 11-12.

Petitioner claims that the prosecutor "manipulat[ed] the random jury process, by having Ms. Schmitz placed in the jury pool to taint anonymous members."  He further claims that a "very real liklihood [sic] exist that Ms. Schmitz tainted other members of the voir dire with her presence . . ."  Pet'r Resp. to Ct. Order, ECF No. 24-1, at 37-38.

Petitioner's claim that the prosecutor manipulated the jury pool is both conclusory and incredible.  The Missouri Court of Appeals found that Petitioner was not prejudiced by Schmitz's presence in the panel because "the panelist who ultimately sat on the jury testified he would presume

[Petitioner] was innocent and would consider alternative sentencing if [Petitioner] was found guilty of first degree murder."  Resp't Ex. H at 12.  The appellate court's findings were not contrary to, or an unreasonable application of, clearly established federal law.  This claim is meritless.

Alleged Error 22

Petitioner argues that trial counsel was ineffective for failing to obtain an aerial photograph of the crime scene.  Petitioner requested that counsel show the jury an aerial view of the railroad tracks he allegedly traveled after initially assaulting Page so that the jury could picture his testimony.  Petitioner has failed to allege prejudice, and he cannot show prejudice in light of the overwhelming evidence of his guilt.  This claim is meritless.

Alleged Error 23

Petitioner alleges that trial counsel was ineffective for failing to move for dismissal of the case for violations of Petitioner's speedy trial rights.

The Sixth Amendment guarantees a criminal Defendant the right to a speedy trial.  To determine whether a speedy trial violation has occurred, courts consider four factors: (1) the length of the delay, (2) the reason for the delay, (3) the Defendant's assertion of his speedy trial right, and (4) the prejudice to the Defendant.  Barker v. Wingo, 407 U.S. 514, 530 (1972).  Petitioner admits that a major reason for the delay in prosecution was that he absconded from justice for several years.  Furthermore, Petitioner has not alleged that he was prejudiced by the delay.  Therefore, this claim is without merit.

Alleged Error 24

Petitioner argues that trial counsel was ineffective for failing to properly impeach Page because of inconsistent statements.  In a supplemental brief, Petitioner claims that many of Page's

statements in federal court or in interviews were inconsistent with her testimony at trial.  Pet'r Supplemental Brief, ECF No. 10-3, at 119-131.  Petitioner has failed to present a convincing argument that Page's previous statements were inconsistent with her trial testimony.  Petitioner has also failed to demonstrate that he was prejudiced by any such statement.  This claim is without merit.

Alleged Error 25

Petitioner argues that trial counsel was ineffective for failing to properly impeach Bethany Forehand because of inconsistent statements.  Petitioner alleges that Ms. Forehand was inconsistent with her statements as to whether Page had planned to sleep over at her house on the night of the incident.  Pet'r Supplemental Brief, ECF No. 10-3, at 135-38.  Petitioner has failed to present a convincing argument that Ms. Forehand's comments were inconsistent, and this testimony is irrelevant to whether Petitioner was guilty of the crime.  Counsel cannot have been ineffective for failing to impeach Ms. Forehand on this testimony.  Petitioner has also failed to demonstrate prejudice.  This claim is without merit.

Alleged Error 26

Petitioner argues that trial counsel was ineffective for failing to object to a silent video showing the interior of the Hallwood house.  Petitioner claims the video "had no evidentiary value, and was shown merely to arouse the passions of the jurors against Petitioner, and evoke sympathy for the victims [*sic*] family."  Petitioner has failed to allege prejudice, and his claim is conclusory.  This claim is without merit.

Alleged Error 27

Petitioner alleges that trial counsel was ineffective for introducing Petitioner's criminal history into evidence.  Petitioner testified at trial, and under Missouri law his criminal history was admissible

so that the jury could judge his credibility.  Mo. Rev. Stat. § 491.050 (2000).  Counsel cannot have been ineffective for introducing Petitioner's criminal history as a matter of trial strategy, rather than allowing the prosecutor to introduce it.  Moreover, Petitioner cannot demonstrate prejudice.  This claim is without merit.

<u>Alleged Error 28</u>

Petitioner alleges that trial counsel was ineffective for failing to object on hearsay grounds when the prosecutor cross-examined him regarding his prior inconsistent statements.  Petitioner claims that the prosecutor asked him whether he had told his roommate at Dismas House that he was upset because Page was seeing a younger man.  Petitioner has not alleged prejudice, and Petitioner cannot demonstrate prejudice in light of the overwhelming evidence of his guilt.  This claim is without merit.

Petitioner has failed to show that any of his grounds for ineffective assistance of trial counsel have "some merit."  As a result, cause for the default cannot be had under <u>Martinez</u>, and Petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  <u>Murray</u>, 477 U.S. at 488.

Petitioner has not alleged that the state prevented him from bringing those claims he raised in his pro se motion in his pro se appeal from the denial of postconviction relief.  Moreover, Petitioner does not have a clearly established right to counsel on appeal from the denial of a motion for postconviction relief.  <u>See</u> <u>Arnold v. Dormire</u>, 675 F.3d 1082, 1087 (8th Cir. 2012).  As a result, the Court finds that Petitioner has failed to show cause and prejudice for the default, and Petitioner's claims in ground one do not have merit or are defaulted, or both.  Petitioner is not entitled to relief on grounds one or six of the petition.

-26-

### 2.       Ground Two: Prosecutorial Misconduct

In ground two of the petition, Petitioner argues that the prosecutor's decision to seek the death penalty was vindictive and motivated by a desire to intimidate him into pleading guilty, and Petitioner claims that the prosecutor "conspired" with the police officer witnesses to present perjured testimony.  Petitioner did not raise these claims on direct appeal.  Petitioner has not argued that there were exceptional circumstances that prevented him from doing so.  See Clark, 859 S.W.2d at 789. As a result, ground two is procedurally barred.

### 3.       Ground Four: Trial Court Error

In ground four of the petition, Petitioner argues that the trial court abused its discretion "during the entire proceedings."  He claims that the trial court erred in denying his motion to dismiss, denying him his speedy trial rights, and by denying his motion for judgment of acquittal.  Petitioner did not raise these claims on direct review, and he has not argued that exceptional circumstances prevented him from doing so.  Therefore, these claims are procedurally barred.

### 4.       Ground Five: Ineffectiveness of Appellate Counsel

In ground five of the petition, Petitioner argues that his direct appeal counsel was ineffective for failing to bring meritorious claims and for failing to request the appellate court to rehear his appeal en banc.  Petitioner does not allege prejudice.  Petitioner did not bring these claims in his pro se appellate brief from the denial of postconviction relief.  Petitioner does not allege that cause and prejudice exist for the default.  As a result, these claims are procedurally barred.

## IV.     MERITS ANALYSIS

### A.      Standard

"In the habeas setting, a federal court is bound by the AEDPA to exercise only limited and deferential review of underlying state court decisions." Lomholt v. Iowa, 327 F.3d 748, 751 (8th Cir. 2003).  Under this standard, a federal court may not grant relief to a state prisoner unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or . . . decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000).  A state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Id. at 407-08.  Finally, a state court decision involves an unreasonable determination of the facts in light of the evidence presented in the state court proceedings only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record.  28 U.S.C. § 2254(e)(1); Ryan v. Clarke, 387 F.3d 785, 790 (8th Cir. 2004).

## B.    Discussion

### 1.    Ground Three: Sufficiency of the Evidence

In ground three, Petitioner alleges that the trial court erred in denying his motion for acquittal at the end of trial because the evidence was insufficient to support the conviction.

-28-

In reviewing a claim of insufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).   In applying this standard, the scope of review is extremely limited.   The Court must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state, and the Court must defer to that resolution.   Whitehead v. Dormire, 340 F.3d 532, 536 (8th Cir. 2003).

On direct appeal, Petitioner argued that there was insufficient evidence to support the convictions for first degree murder and first degree burglary.   Resp't Ex. D at 11-12.   The Missouri Court of Appeals applied the correct standard to these claims: "where there is sufficient evidence from which a reasonable finder of fact might have found [Petitioner] guilty beyond a reasonable doubt."   Resp't Ex. D at 13.

Petitioner argued on appeal that there was insufficient evidence to support the conviction for first degree murder because the state failed to show that he deliberated before shooting Mr. Forehand. In rejecting this claim, the appellate court found that the evidence of Petitioner's guilt was "substantial":

> First, [Petitioner] was seen by Sister sneaking around the back of the house toward the basement.  [Petitioner] admitted proceeding toward the side door and then the basement in his search for Girlfriend.  This act alone may bee seen as a "deliberate act" to further the purpose of breaking and entering the Hallwood address. . . . Additionally, five shots were fired at the victim, two of which hit him.  The multiple shots are additional evidence allowing the jury to infer that [Petitioner] deliberated over killing Mr. Forehand.
>
> We acknowledge that there was no eye-witness to the shooting and the evidence of [Petitioner's] guilt was circumstantial.  Nevertheless, we find that the jury reasonably could have construed the substantial evidence as supporting a conviction of first-

-29-

degree murder. . . .  The testimony of Girlfriend provided that [Petitioner] had blood on his hands when he came to the bedroom to find her.  The police confirmed a finding of blood on the Mazda's steering wheel after [Petitioner] had been driving, as well as on a fence over which [Petitioner] had escaped.  Laboratory tests confirmed that the blood came from Mr. Forehand, proving that [Petitioner] was present at the particular place where Mr. Forehand's body laid following the shooting.  That the prints on the walls were in blood supports a number of inferences.  One reasonable inference is that blood spattered on [Petitioner's] hands as he held and shot the revolver at Mr. Forehand from close range, especially considering that the revolver also had Mr. Forehand's blood on it.  Another inference is that [Petitioner], as he testified, tried to help Mr. Forehand after he was shot by Squirrel, and got blood on himself in the process.

Additional circumstances also point to an inference that [Petitioner] killed Mr. Forehand, including [Petitioner's] carrying the gun with him in continued pursuit of Girlfriend instead of calling for help for Mr. Forehand, [Petitioner's] forcing Girlfriend into the car, the police finding the revolver in a place consistent with Girlfriend's testimony that she threw it from the car, and [Petitioner's] escape from the police.  Here, "all of [Petitioner's] activities after the murder were undertaken with a somewhat chilling nonchalance about the events, demonstrating [Petitioner's] complete state of indifference to the shooting of Mr. Forehand, which also supports the jury's finding of deliberation.

Id. at 16-17 (quotations, alteration, and citation omitted).

The Missouri Court of Appeals' ruling was not contrary to, or an unreasonable application of, clearly established federal law.  There was substantial evidence at trial from which a reasonable factfinder could have found that Petitioner deliberated before shooting Mr. Forehand.

Petitioner argues that there was insufficient evidence to support the conviction for first degree burglary because the state failed to show that he went to the Hallwood address with the intent to kidnap Page.  Petitioner maintains that the state's theory in the indictment was that he went to the house with the intent to kill Page, and therefore, the evidence was insufficient to support an inference that he went there with the intent to kidnap.

Under Missouri law,

-30-

A person commits the crime of burglary in the first degree if he knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein, and when in effecting entry or while in the building or inhabitable structure or in immediate flight therefrom, he or another participant in the crime:

> (1) Is armed with explosives or a deadly weapon or;
>
> (2) Causes or threatens immediate physical injury to any person who is not a participant in the crime; or
>
> (3) There is present in the structure another person who is not a participant in the crime.

Mo. Rev. Stat. § 569.160.1 (2000).

In rejecting Petitioner's claim, the Missouri Court of Appeals stated:

Here, the evidence showed that [Petitioner] approached the basement of the Forehand's home where he met Mr. Forehand. Mr. Forehand was shot by two bullets, although five rounds were fired from the gun. [Petitioner] left Mr. Forehand's bloody body, entered the house through the basement, and tracked bloody footprints and handprints upstairs where he found Girlfriend. Girlfriend testified that [Petitioner] dragged her and forced her to come with him by pointing his gun at her niece, so Girlfriend complied by leaving with him, as [Petitioner] then pointed the gun at her. Officer Molden testified that he witnessed Girlfriend attempting to flee from and being dragged by the moving Mazda in which [Petitioner] was driving.

[Petitioner] admits the fact that he kidnapped Girlfriend is some evidence of his purpose at the moment he did so, but argues that it is not proof beyond a reasonable doubt that he had that purpose when he *entered* the house. Given the circumstances around which Girlfriend was kidnapped, we find that a reasonable jury could infer that [Petitioner] entered the house with the purpose to kill Girlfriend. On the other hand, a jury could also reasonably infer that [Petitioner] killed Mr. Forehand and then, not wanting to kill again, entered the house with the purpose to only kidnap Girlfriend, which is supported by the evidence showing [Petitioner] actually did kidnap her. The evidence was such that the jury did not need to speculate, but simply make a reasonable inference based on the evidence before it.

Resp't Ex. D at 19 (emphasis in original).

This Court agrees that there was sufficient evidence such that any rational trier of fact could have found Petitioner guilty of first degree burglary.  The Missouri Court of Appeals' decision was not contrary to, or an unreasonable application of, clearly established federal law.

Petitioner also claims that there was insufficient evidence to support the convictions for unlawful use of a weapon or first degree assault.  Petitioner did not bring these claims on direct appeal, however.  Therefore, these claims are procedurally defaulted.  Petitioner has not alleged cause or prejudice for the default.

Petitioner is not entitled to relief on ground three of the petition.

2.      Ground Seven: Appellate Court Error

In ground seven, Petitioner argues that the Missouri Court of Appeals violated his constitutional rights by rejecting his claims.  For the most part, Petitioner is merely repeating his sufficiency of the evidence claims recast as appellate court error rather than trial court error.  These claims are not cognizable in federal habeas corpus proceedings.

Respondent concedes, however, that Petitioner has properly brought a claim that the prosecution violated the Interstate Agreement on Detainers ("IAD") speedy trial requirement.  The Missouri Court of Appeals denied relief on the basis that Petitioner was turned over to Missouri custody on a writ of habeas corpus ad prosequendum and not on a detainer.  Resp't Ex. D at 21.  "Where a federal prisoner's appearances in a state court are obtained via a writ of habeas corpus ad prosequendum, the IAD is not applicable."  Id. (citing Missouri v. Leisure, 810 S.W.2d 560, 576 (Mo. Ct. App. 1991)).

Petitioner does not deny that he was transferred to Missouri via a writ of habeas corpus ad prosequendum.  The Missouri Court of Appeals' decision was not contrary to, or an unreasonable

application of, clearly established federal law.  See United States v. Moore, 822 F.2d 36, 37 (8th Cir. 1987) ("When . . . the government secures the presence of a state prisoner by means of the writ without filing a detainer, the IADA is inapplicable.").

## V.   CONCLUSION

For these reasons, Petitioner is not entitled to federal habeas relief.  Furthermore, Petitioner has failed to make a substantial showing of the denial of a constitutional right, which requires a demonstration "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right."   Khaimov v. Crist, 297 F.3d 783, 785 (8th Cir. 2002) (quotation omitted).  Thus, the Court will not issue a Certificate of Appealability.  28 U.S.C. § 2253(c).

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DISMISSED**.

**IT IS FURTHER ORDERED** that no certificate of appealability shall issue.  28 U.S.C. § 2253.

A separate Judgment will be filed forthwith.

Dated this 23rd   day of December, 2013.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

-33-